IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

GARY BERNARD WILLIAMS,

    Petitioner,

        v.                     CIVIL NO.:     WDQ-11-0849
                                  CRIMINAL NO.:  WDQ-07-0402
UNITED STATES OF AMERICA,

    Respondent.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

Gary Bernard Williams was convicted of three counts of
distribution and possession with intent to distribute cocaine
base and cocaine.  On May 16, 2008, he was sentenced to 120
months imprisonment on counts one and two, and life imprisonment
on count three, all to run concurrently.  ECF No. 55.  Pending
are Williams's motion to vacate, set aside, or correct his
sentence under 28 U.S.C. § 2255, ECF No. 89, and the
government's motion in *limine* to exclude expert testimony, ECF
No. 107.[1]  A hearing was held on July 19, 2012.  ECF No. 112.
For the following reasons, Williams's motion to correct sentence
will be denied.

---

[1] In the government's supplemental memorandum, filed after the
§ 2255 hearing, the government "requests the Court strike the
expert testimony, and, or in the alternative, deny the petition
for relief."  ECF No. 115 at 1.  Because the Court will deny
Williams's § 2255 petition, the government's motion in *limine*
will be denied as moot.

I. Background

On September 4, 2007, Williams was indicted on two counts of distribution of cocaine and one count of distribution of 50 grams or more of cocaine base in violation of 21 U.S.C. § 841(a). ECF Nos. 1, 93 at 1. He pled not-guilty and retained Christie Needleman, Esquire, to defend him. ECF Nos. 14, 15.

The Court heard and denied several motions to suppress, and on December 17-19, 2007, Williams had a jury trial. Among others, Drug Enforcement Administration ("DEA") Agent Troy Wilson testified. ECF No. 68 at 5. Agent Wilson was qualified as an expert in narcotics investigations. *Id.* at 8-9. During Agent Wilson's testimony, the government played portions of audio recordings of Williams selling drugs to Robin Welshons, who was working with the DEA. *See, e.g., id.* at 20-22. Wilson explained what was happening in the recordings to the jury and interpreted the language used by Welshons and Williams to refer to the drugs.[2] *See id.* Needleman unsuccessfully objected to Wilson's testimony interpreting "drug jargon" because "he wouldn't actually be interpreting the language as an expert . . . but, rather, he would be repeating what he was told . . . by

---

[2] For example, Agent Wilson explained that Welshon's statement, "'Can you whip some up for me?'" meant that she was "asking for Mr. Williams to . . . cook the cocaine into crack." ECF No. 68 at 21.

an unavailable witness."[3]  *Id.* at 3.  She did not object when he was offered as an expert.  *Id.* at 9.

On December 19, the jury found Williams guilty on all counts.  ECF No. 31.

On February 15, 2008, the United States Probation office completed a pre-sentence report ("PSR").  The report concluded that Williams's offense level was 30, he was not eligible for any adjustments, and his criminal history category was VI.  This yielded an advisory guidelines sentencing range of 168 to 210 months.  Probation recommended sentencing Williams within the guidelines, to 168 months imprisonment on each count, to run concurrently.  PSR (sealed).  The PSR did not include any victims of the offense.  *Id.* at 3.

On April 15, 2008, the government submitted a sentencing memorandum noting that it intended to seek life imprisonment without parole because, it contended, Williams's related conduct included murdering Welshons, the cooperating witness.  ECF No. 36 at 4.  Williams argued that the allegation that he had caused her death was unreliable.  ECF No. 52 at 1-2.  The government argued that "under the cross reference set forth in §2D1.1, a

---

[3] The witness was Robin Welshons who was unavailable because she had been murdered before trial.  *See* ECF No. 54 at 5.  The government did not refer to the reason that Welshons was unavailable to testify and did not suggest Williams was the cause of her unavailability.  *See, e.g.*, ECF No. 69 at 21, 32.

sentence of life without parole, (First Degree Murder) . . . is within the advisory guidelines." ECF No. 89 at 17. Above that sentence, Needleman wrote the following note to Williams: "Gov't is referring to 2D1.1(a)(2) + 2D1.1(a)(1) (p. 135). This § does not apply. This § is for when some[one] dies using substance sold." *Id.*

At the sentencing, the Court heard testimony from two investigators implicating Williams as Welshons's killer.[4] ECF No. 54 at 5-8. The Court concluded that

> Williams's recorded threats to Welshons, his boast that he knew the female who had informed on him, his visit to Welshons's workplace and "dirty looks" at her, his father's provision of a .357 revolver to him, the bullet fragments recovered from Welshons's body, the lack of shell casings at the scene (indicative of a revolver rather than a semiautomatic pistol), Williams's direction to his father to dispose only of the .357 cartridges and a revolver holster (although [the father] had retained another gun for Williams), and Williams's laughter when informed of Welshons's murder-all convince the Court that it is more likely than not that Williams committed, aided, abetted, counseled, commanded, induced, procured, and willfully caused Welshons's murder.

*Id.* at 8.

Applying the advisory sentencing guidelines, the Court noted that the applicable guideline for Williams's drug

---

[4] The Court considered some hearsay testimony that would not have been admissible at trial, but "the Federal Rules of Evidence do not apply at sentencing. Fed. R. Evid. 1101(d)(3)." ECF No. 54 at 5. The Court found that the otherwise inadmissible hearsay was reliable, and "reliable hearsay testimony may properly be considered by sentencing judges." *Id.* at 5, 8 (*citing United States v. Terry*, 916 F.2d 157, 160-61 (4th Cir. 1990)).

4

convictions, § 2D1.1, contains a cross reference to the first-degree murder guideline, § 2A1.1. *Id.* at 11. That guideline applies if "a victim was killed under circumstances that would constitute [first degree] murder . . . if the resulting offense level is greater than that determined under [§ 2D1.1]." *Id.* (*quoting* U.S.S.G. § 2D1.1(d)(1)) (internal quotation marks omitted).

The Court found that the cross reference to §2A1.1 applied. *Id.*; Statement of Reasons ("SOR") (sealed). It concluded that Williams's offense level was 30 on counts one and two, and 43 on count three. SOR at 1. Within a criminal history category VI, Williams's advisory guidelines range was 168-210 months as to counts one and two, and 360 months to life as to count three.[5] On May 16, 2008, the Court sentenced Williams to 120 months imprisonment on counts one and two, and life imprisonment on count three, all to run concurrently. ECF No. 55.

On May 22, 2008, Williams appealed his sentence, arguing that (1) Needleman had a conflict of interest[6] when she

---

[5] The 2007 edition of the Guidelines Manual was used in this case. PSR at 2. That edition states that an offender with offense level 43, regardless of his criminal history category, has an advisory guidelines sentence of life. U.S.S.G. Ch. 5 Pt. A (Nov. 1, 2007).

[6] Williams asserted that Needleman had a conflict, because she requested representation by counsel at Williams's sentencing hearing due to concerns that Williams's family believed she had encouraged him to murder Welshons. ECF No. 72 at 1-2. The

5

represented him and should have been replaced; (2) he did not receive enough notice of the government's evidence of the murder or time to prepare his defense to the sentencing; and (3) the Court should have been required to find the aggravating sentencing factor by a more stringent standard of proof than a preponderance of the evidence. ECF No. 72 at 2. The Fourth Circuit affirmed the sentence. *Id.* at 8. The decision took effect on September 22, 2009. ECF No. 73. On March 29, 2010, the Supreme Court denied *certiorari*. ECF No. 89 at 3.

On March 22, 2011, Williams signed a § 2255 motion to vacate his sentence and delivered it to prison authorities. ECF No. 89 at 18. The government opposed the motion. ECF No. 93. It provided an affidavit by Needleman stating that she "discussed the government's plea offer in detail" with Williams and explained that under the offer he would likely be sentenced to between 168 and 210 months, and if he went to trial, the government would seek a life sentence based on Welshons's death. ECF No. 93-1 at 1-2. She stated in the affidavit that she:

> never advised Mr. Williams . . . that the government could not use Robin Welshons'[s] murder at sentencing, or that the cross reference to the murder would not apply at sentencing. [She] never advised Mr. Williams

government informed the Court that it had no evidence tying Needleman to the murder and that Williams's family did not actually believe Needleman was involved. *Id.* at 2. Thus, because a conflict never actually arose, the Fourth Circuit rejected Williams's argument on appeal that Needleman should have been removed. *Id.* at 4.

that the maximum sentence he could receive would be
168-210 months. [She] also never advised Mr. Williams
that [she] would be able to get him a sentence below
the guideline range if he was found guilty at trial.

*Id.* at 2.

Needleman also acknowledged that she wrote the notes on the
government's sentencing memorandum, that she made a correct
statement of the law--that U.S.S.G. § 2D1.1(a)(1) and (a)(2)
would not apply to Williams's conduct--and she "explained . . .
that the government was seeking the cross reference under"
§ 2D1.1(d)(1), a different subsection. *Id.* She contended that
Williams took the notes "out of context of our discussions."
*Id.* Needleman affirmed that she discussed "all of the options"
with Williams, and "it was his decision to go to trial," not
hers. *Id.* at 3. She averred that she never advised Williams
"to either take the plea or proceed to trial." *Id.*

On February 23, 2012, the Court appointed Justin Brown,
Esquire, to represent Williams in an evidentiary hearing on his
§ 2255 motion. ECF Nos. 95-96, 112.[7] At the July 19, 2012
hearing, the Court heard testimony from Gerard Martin, Esquire,
whom the Court qualified as an expert in federal criminal
defense,[8] Williams, and Needleman. ECF No. 112 at 2. Martin,

---

[7] All references to the hearing transcript will be designated by
citations to "ECF No. 112."

[8] ECF No. 112 at 10. Before the hearing, the government filed a
motion in *limine* to exclude Martin's testimony. ECF Nos. 107,

7

appearing on behalf of Williams, testified about the professional standards of defense attorneys in the plea bargaining process. *See, e.g. id.* at 16-17.

Williams testified that Needleman told him that the government's case against him was weak and she thought she "could beat the charges;" she acted "nonchalantly" about the possible murder cross reference and told him it was "impossible" for the government to obtain the enhancement; she never showed him the written plea agreement; and she strongly urged him to go to trial. *See id.* at 39-44. However, he also testified that she told him about the plea deal before trial, and he knew the government would not seek a sentencing enhancement for the murder if he pled guilty. *See id.* at 42. He admitted that he expressed gratitude in several letters to Needleman for her work in representing him, even after the sentencing. *See id.* at 50. Finally, Williams confirmed that he wrote notes to Needleman during the trial that acknowledged that he could receive a life sentence if convicted. *Id.* at 51-52.

Needleman testified that she and Williams had an exceptionally good attorney-client relationship, collaborated

---

112 at 4-5. The Court withheld its ruling on the motion until after the hearing. ECF No. 112 at 5. After the hearing, the government moved to strike Martin's testimony, or, in the alternative, to deny Williams's petition for relief. ECF No. 115 at 1. Because the Court will deny Williams's petition, the motion in *limine* will be denied as moot.

closely on trial strategy, and had in-depth discussions on his sentencing risk if he rejected the plea and went to trial.[9] *See id.* at 59-61, 64. She also testified that Williams told her several times that the government could not connect him to Welshons's murder, and she believed him because they had such a good relationship. *Id.* at 64-69. She stated that she discovered later Williams lied to her about the existence of evidence tying him to the murder, and that going to trial was only an "acceptable" risk if the government "was bluffing, as Gary told [her]," about having such evidence. *Id.* at 83, 109-110. Finally, she testified that, although she advised Williams on his options and their likely consequences, the final decision to go to trial was Williams's choice. *Id.* at 69-71, 88.

On October 4, 2012, the parties filed supplemental briefing. ECF Nos. 115, 116. On January 24, 2013, Williams, through counsel, requested that the Court defer its decision pending the Supreme Court's ruling in *Alleyne v. United States*. ECF No. 117. On June 17, 2013, *Alleyne* was decided. ECF No. 118. That day, the Court ordered the parties to submit supplemental memoranda addressing *Alleyne*. ECF No. 118. The next day, the government filed its response. ECF No. 120. On

---

[9] She also testified that she showed Williams the written plea agreement and always showed the defendant the written plea agreement in every case she handled. ECF No. 112 at 63.

9

July 3, 2013, Brown submitted Williams's *pro se* submission and stated that would be his only briefing.  ECF No. 121.

II. Analysis

Williams contends that his sentence should be vacated because: (1) he received ineffective assistance of counsel because Needleman (a) told him not to plead guilty pursuant to a plea agreement and (b) failed to object to opinion testimony at trial; and (2) his "mandatory" life sentence is unconstitutional.  ECF No. 89 at 5.

A. Timeliness

The government asserts that the motion should be dismissed as untimely.  ECF No. 93 at 6-7.  Under 28 U.S.C. § 2255(f)(1), a prisoner must file his motion to vacate within one year of the date on which the conviction becomes final.  A conviction becomes final for the purpose of § 2255 when the Supreme Court denies a petition for *certiorari*.  *Clay v. United States*, 537 U.S. 522, 527 (2003).  A *pro se* prisoner files a § 2255 motion when he "sign[s], execute[s], and deliver[s] the petition to the prison authorities for mailing."  *United States v. Bell*, 203 F. Supp. 2d 1287, 1291 (S.D. Ala. 2002) (internal quotation marks

omitted); *United States v. Dorsey*, 988 F. Supp. 917, 919-20 (D. Md. 1998).[10]

The Supreme Court denied Williams's petition for *certiorari* on March 29, 2010. ECF No. 89 at 3. Accordingly, he had to file his petition by March 29, 2011. *See* 28 U.S.C. § 2255(f)(1). Williams deposited his § 2255 motion in the prison legal mailbox on March 22, 2011. ECF No. 89 at 18. The petition was timely.

B. Ineffective Assistance of Counsel

1. Legal Standard

The Sixth Amendment guarantees the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prove ineffective assistance, Williams must show: (1) counsel's performance was deficient and (2) the deficiency prejudiced his defense. *Id*. at 687. To show deficient performance, Williams must establish that counsel made errors so serious that the "representation fell below an objective standard of reasonableness." *Id*. at 688. To show prejudice, he must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "There exists a strong presumption that counsel's conduct was within a wide range of

---

[10] *See also Houston v. Lock*, 487 U.S. 266, 270-71 (1988) (*Pro se* prisoners' filings are considered filed when delivered to prison authorities for forwarding to the court.).

11

reasonably professional conduct. . . ." *Kratsas v. United States*, 102 F. Supp. 2d 320, 322 (D. Md. 2000) *aff'd,* 9 F. App'x 107 (4th Cir. 2001) *(citing id.* at 688-89).

2. Advice to Reject Plea Offer

Williams contends that Needleman: (1) "advised [him] not to take the government's plea offer because the government could not use Robin Welshons['s] murder to enhance [him] at sentencing under the murder cross reference;" (2) told him he would face a sentence between 168 and 210 months "whether [he] went to trial or took a plea;" and (3) told him she "could get [him] a sentence below [the] guideline range if [he] was found guilty at trial." ECF No. 89 at 8. The government contends that Williams's testimony was not credible, because his trial notes to Needleman contradict his testimony that Needleman told him the government could not obtain the murder cross reference. ECF No. 115 at 5-6. It also asserts that Needleman's testimony shows that she fully advised Williams on his options and sentencing risk, and that "she indicated repeatedly to defendant that if he elected to go to trial and the government had evidence that linked him to the [Welshons murder], he could be facing a life sentence." *Id.* at 7-10, 15.

When the government tenders a plea offer, counsel should: (1) notify her client of the offer; (2) advise her client that he may reject the offer and proceed to trial; (3) give her

12

opinion of the likely outcome of the guilt and sentencing phase,
if the offender goes to trial; and (4) ensure that the decision
whether to accept the plea offer is ultimately made by the
client. *See Jones v. Murray*, 947 F.2d 1106, 1110-11 (4th Cir.
1991), *quoted in Kratsas*, 102 F. Supp. 2d at 325. There is
"nothing . . . to suggest that a client, who was properly
advised but misunderstood such advice, received ineffective
assistance of counsel." *Kratsas*, 102 F. Supp. 2d at 325.

Counsel provides ineffective assistance of counsel when she
inaccurately assesses a "defendant's potential sentence after
trial and the defendant . . . would have accepted the plea offer
if he were properly informed." *Id.* at 323. The inaccurate
assessment must constitute "gross misadvice" to satisfy the
first *Strickland* prong. *United States v. Merritt*, 102 F. App'x
303, 307 (4th Cir. 2004). The defendant must then show that,
"but for this gross misadvice, there is a reasonable probability
that the defendant would have accepted the plea agreement
specifying a lower sentence of imprisonment." *Evans v. Dir. of
Dep't of Corr.*, CIV. A. 3:07CV326, 2008 WL 780706, at *5 (E.D.
Va. Mar. 24, 2008) (*citing id.*) (internal quotation marks and
punctuation omitted); *Merritt*, 102 F. App'x at 307; *cf. Hill v.
Lockhart*, 474 U.S. 52, 59 (1985). To meet this burden, the
defendant generally must produce "some objective evidence" to
support his claim that "he relied on counsel's erroneous

advice," rather than merely offer his own "self-serving statement[s]." *Evans*, 2008 WL 780706, at *5.

Williams's testimony that Needleman told him that "the government could not use Robin Welshons['s] murder to enhance me at sentencing" is not credible.[11] ECF No. 89 at 8. Needleman testified that she fully informed Williams about the terms of the plea agreement,[12] and the government's plans to use the murder cross reference at sentencing if he did not plead guilty. *See* ECF No. 112 at 64 (Needleman's discussion with Williams on

---

[11] Williams's allegation that Needleman told him "she could get [him] a sentence below my guideline range if I was found guilty at trial" is also not credible. ECF No. 89 at 8. Needleman testified that she discussed the sentencing guidelines with Williams at length, and both concluded that, if Williams pled guilty and accepted responsibility, he would face a sentence only a few years shorter than if convicted (168 to 210 months if convicted, 130 to 162 months if he pled guilty, assuming the murder cross reference did not apply). ECF No. 112 at 42, 61-62. Accordingly, Needleman's testimony establishes that, by going to trial, she and Williams assumed the risk that he would be sentenced within the guidelines. *See id.*; *see also* ECF No. 112 at 70 ("I thought it best that we discussed the difference in the guidelines from pleading to going to trial and not accepting responsibility. We both agreed that is an acceptable level of risk in going to trial."); ECF No. 112 at 62 (Needleman "never said that" Williams "could receive a sentence of 10 years or so"--a sentence below the guidelines).

[12] Williams testified that Needleman never showed him the written, proposed plea agreement. ECF No. 112 at 41-42. Needleman testified that she showed him the proposed agreement, and it was her practice in every "case [she] handled" to show the defendant the written plea agreement. *Id.* at 63. The Court credits the testimony of Needleman, an experienced defense attorney who has handled thousands of criminal cases, on this issue. *See id.* at 56-57.

the issue was "in depth"). She questioned Williams multiple times about the Welshons murder, and they agreed that he should go to trial if the government did not have evidence to connect him to the murder. *See, e.g., id.* at 64-69. Williams repeatedly asserted that the government had no such evidence.[13] *See id.* at 66 (Williams "was very adamant" in his discussions with Needleman that he could not be connected to the murder). Their exceptionally good relationship,[14] Williams's intelligence and engagement in his case strategy,[15] and his repeated assurances[16] caused her to believe his statements that the

---

[13] Williams testified that Needleman told him there "was absolutely no way" his sentence could be enhanced using the murder cross reference. ECF No. 112 at 39-40. This testimony is not only contradicted by Needleman's testimony, *see, e.g., id.* at 62, but also by Williams's notes to Needleman during the trial which stated, *inter alia*, "'This is my life on the line'" and "'I would like to know if you are going to tell them that I am facing up to life for count 3.'" *Id.* at 52.

[14] Williams was "happy and surprised" that Needleman agreed to represent him in the trial. ECF No. 112 at 36. Needleman testified that she "had a very good relationship with" Williams, which lasted through the conclusion of trial. *Id.* at 59-60. Even after the sentencing, Williams sent Needleman a letter which stated, *inter alia*, "I never told [my family member] anything bad about you, I didn't even have anything bad to say. What could I say? The lady looks out for me." *Id.* at 50.

[15] *See, e.g.*, ECF No. 112 at 70 ("[H]e just had a firm grasp on what the risks were and whether he was willing to roll the dice and go to trial.").

[16] Needleman trusted Williams's version of events in part because they had such a good relationship. She testified:

government could not connect him to the murder. *See, e.g.*, *id.* at 59, 69-70. Finally, Williams admitted[17] that he was aware before trial that the government could seek a life sentence if he did not plead guilty. *See id.* at 39. Yet, he decided to go to trial anyway.[18] *Id.* at 69 ("We [had] a heart to heart about

---

And in this particular case I felt I had a better than average communication relationship with Gary. I [had] represented him a long time . . . [In] the past, he had been very forthcoming with me in terms of his guilt or involvement with certain things or what evidence might be presented . . . . So I definitely based on our history took him at his word.

ECF No. 112 at 68.

[17]      Government: "And did Ms. Needleman tell you what the
                      Government was threatening your sentence would
                      be if that happened?"
          Williams:   "Yes."
          Government: "What did she say?"
          Williams:   "She said they were seeking a life sentence."

ECF No. 112 at 39.

[18] Needleman concurred with Williams's decision to go to trial, on the condition that the government could not produce evidence connecting him to the murder. ECF No. 112 at 109. If he was sentenced according to the guidelines, she believed he would be sentenced to about 11 years if he pled guilty, and about 14 years if he was convicted. *See id.* at 110. The three-year difference in sentence was "an acceptable level of risk" to Williams. *See id.* Considering that Williams knew about the possible murder cross reference but remained "adamant" that the government "was bluffing" about evidence connecting him to the murder, *id.*, Needleman's advice to go to trial did not rise to the level of "gross misadvice." *Id.* at 110, 115; *Clark v. United States*, RWT 07CR281, 2012 WL 253436, at *3 (D. Md. Jan. 26, 2012) (Counsel did not give defendant "gross misadvice," in part because defendant was "[a]ware of his sentencing exposure.").

16

what evidence" the government possibly had to connect Williams
to Welshons's murder, "and so based on our conversation, Gary
still felt that he wanted to go to trial."). Thus, the evidence
does not support Williams's assertion that he only went to trial
because Needleman told him he could not receive a life
sentence.[19]

The Court credits Needleman's testimony, which establishes
that her conduct in representing Williams was within the "wide
range of reasonable professional assistance." *See Strickland*,
466 U.S. at 690. At the hearing, she repeatedly testified that
she informed Williams of the government's plea offer and the
possibility of the murder cross reference at sentencing if he
went to trial and was convicted. *See, e.g.*, ECF No. 112 at 63-
64. She informed Williams that he had the right to accept the

---

[19] Williams asserts that Needleman's notes on the PSR indicating
that a cross reference to first degree murder in § 2D1.1(a) did
not apply in his case provides evidence that "Needleman believed
the government was incapable of using the cross reference
against me." ECF Nos. 89 at 10, 17. Needleman's note is a
correct statement, because this cross reference from the 2007
sentencing guidelines referred to death "result[ing] from the
use of the substance." U.S.S.G. § 2D1(a) (Nov. 1, 2007).
Welshons did not die from use of cocaine or cocaine base. ECF
No. 54 at 4. Moreover, this note does not contradict
Needleman's statements that she told Williams before trial that
the government could apply a different cross reference from the
guidelines--§ 2D1.1(d)(1)-- which applies when "a victim was
killed under circumstances that would constitute murder[.]"
U.S.S.G. § 2D1(d)(1) (Nov. 1, 2007); ECF Nos. 93-1 at 2, 112 at
66-67.

17

plea or reject it and go to trial. *Id.* They discussed the likely sentence Williams would receive (life imprisonment) if he was convicted at trial and the government successfully sought an enhancement for Welshons's murder. *See id.* at 63-64, 87. She also ensured that the ultimate decision to go to trial was Williams's choice. *See id.* at 70. Because this evidence establishes that Needleman told Williams about the plea deal, fully advised him on the consequences of all his options, and allowed him to decide whether to accept the plea, Needleman's performance was not deficient. *See Jones*, 947 F.2d at 1110-11; *Kratsas*, 102 F. Supp. 2d at 325. Accordingly, Williams's petition will be denied as to his claim of ineffective assistance of counsel during the plea bargaining process.

3. Failure to Object to Trial Testimony

Williams contends that Needleman was ineffective for failing to object when, allegedly, Wilson "us[ed his] own lay opinion to interpret or distinguish evidence." ECF No. 94 at 9. The government contends that Williams waived that argument because Needleman *did* object to Wilson's testimony, and Williams failed to raise the issue on appeal. ECF No. 93 at 8-10.

"[C]ourts of appeals have routinely held that law enforcement officers with extensive drug experience are qualified to give expert testimony on the meaning of drug-related code words." *United States v. Wilson*, 484 F.3d 267, 275

18

(4th Cir. 2007).[20] Like all expert witnesses, the witness must first demonstrate that his testimony is "the product of reliable principles and methods that are reliably applied to the facts of the case." *Id.* at 274 (*citing* Fed. R. Evid. 702, advisory committee note) (internal quotation marks omitted). A witness who is an expert in the field because of his experience must "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." *Id.* (*quoting* Fed. R. Evid. 702, advisory committee note) (alterations in original).

It is sufficient for a police officer with extensive, local experience investigating narcotics trafficking to testify that: (1) "his experience and training in investigating narcotics trafficking confirmed that drug dealers often use coded words and phrases in describing their business;" (2) he had listened to the intercepted conversations for words that appeared to have a "drug meaning" in addition to their dictionary meaning; and (3) "[b]y listening to a number of drug-related conversations in

---

[20] *Citing United States v. Gibbs*, 190 F.3d 188, 211 (3d Cir. 1999); *United States v. Griffith*, 118 F.3d 318, 321-22 (5th Cir. 1997); *United States v. Delpit*, 94 F.3d 1134, 1145 (8th Cir. 1996); *United States v. Garcia*, 291 F.3d 127, 139 (2d Cir. 2002).

context, he was able to sometimes identify a word pattern that led him to decipher the code." *Id.* at 275.[21]

Wilson was a seven-year veteran of the DEA when he testified. ECF No. 68 at 5. He completed training "on everything involving narcotics investigations," including the way in which drug traffickers and distributers handled crack and powder cocaine. *Id.* at 5-6. He had investigated hundreds of drug-related offenses, including at least ten to 15 wiretap investigations. *Id.* at 6-7. He had interpreted and "personally listened to thousands" of conversations between drug dealers, and had made or assisted with undercover calls to suspects. *Id.* at 7-8. Wilson was properly qualified to interpret the conversations. *See Wilson*, 484 F.3d at 275.

It was not error for Needleman not to challenge Wilson's interpretation of the conversations.[22] Williams has not shown

----

[21] The Court affirmed admission of expert testimony interpreting conversations when the witness, "a nine-year veteran of the Baltimore County Police Department," had spent most of that time investigating narcotics trafficking, participated in "hundreds of drug investigations and arrests," attended DEA seminars and classes, and had been trained in understanding coded language. *Wilson*, 484 F.3d at 275.

[22] *Cf. Williams v. United States*, CIV. CCB-07-2111, 2008 WL 4615460, at *2 (D. Md. Oct. 16, 2008) (no constitutionally ineffective assistance of counsel when attorney failed to object to non-expert testimony offered by a police officer on issues "well within his daily experience as a law enforcement officer").

that Needleman provided ineffective assistance of counsel under *Strickland*. 466 U.S. at 686.

B. Life Sentence

Williams also argues that his "mandatory life sentence" is unconstitutional because it exceeds the statutory maximum. ECF No. 94 at 12-13. The government contends that he raised that argument on appeal, and it is now barred. ECF No. 93 at 12.

As articulated by the Fourth Circuit, Williams's argument on appeal was "that a standard of proof higher than a preponderance should be required." *United States v. Williams*, 343 F. App'x 912, 913 (4th Cir. 2009) (per curiam). That argument is not the same as Williams's current constitutional argument, which concerns the application of 21 U.S.C. § 841(b)(1)(A). ECF No. 94 at 13. Accordingly, Williams is not barred from bringing this claim on collateral attack. *Cf. United States v. Mikalajunas*, 186 F.3d 490, 492-93 (4th Cir. 1999).

The jury convicted Williams of distributing 50 grams or more of cocaine base, in violation of 21 U.S.C. § 841(a). *See* ECF No. 31. In 2008, § 841(b)(1)(A)(iii) authorized imprisonment for at least ten years, and not more than life, absent aggravating circumstances, if the offense involved 50 grams or more of a mixture containing cocaine base. § 841(b)(1)(A)(iii) (2006). Williams contends that that section

21

authorizes life imprisonment "only . . . if [the defendant] had two prior con[vict]ions for serious drug offenses." ECF No. 94 at 13. Accordingly, he argues that under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Court cannot exceed the statutory maximum. ECF No. 89 at 14.

Williams misinterprets the statute. Section 841(b)(1)(A) *requires* that a life sentence be imposed if the defendant had two serious drug convictions, but *allows* the Court to impose up to life imprisonment without that requirement. *See* § 841(b)(1)(A) (2006). Accordingly, Williams did not receive a "mandatory" life sentence; his sentence was within the statutory range for the offense for which the jury convicted him.

Williams also contends that his sentence is unconstitutional under *Alleyne*. ECF No. 121-1. In *Alleyne*, the Supreme Court held that "[f]acts that increase the mandatory minimum sentence . . . must be submitted to the jury and found beyond a reasonable doubt." *Alleyne v. United States*, 133 S. Ct. 2151, 2158, 186 L. Ed. 2d 314 (2013). As just discussed, no mandatory minimum sentence was imposed, and Williams's sentence was within the range authorized by the crime for which Williams was convicted by the jury. § 841(b)(1)(A) (2006). Accordingly, *Alleyne* is inapplicable, and Williams's sentence did not violate the Constitution.

## C. Certificate of Appealability

A certificate of appealability ("COA") must issue before a petitioner may appeal the court's decision in a § 2255 case. *See* 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b). A COA may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." § 2253(c)(2). The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (*quoting Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (internal quotation marks omitted). Denial of a COA does not prevent the petitioner from seeking permission to file a successive petition or pursuing his claims upon receipt of such permission.

Because Williams has not made a substantial showing of the denial of his constitutional rights, the Court will not issue a COA.

III. Conclusion

For the reasons stated above, Williams's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 will be denied, and the government's motion in *limine* to exclude expert testimony will be denied as moot.

_____10/17/13_____
Date

_____
William D. Quarles, Jr.
United States District Judge